**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>

THE RODGERS GROUP, LLC, *et al.*,

                Plaintiffs,

           v.

MADELINE LEWIS, *et al.*,

                Defendants.

</td><td>

Civil Action No. 22-482 (MAS) (TJB)

**MEMORANDUM OPINION**

</td></tr>
</table>

**SHIPP, District Judge**

      This matter comes before the Court upon The Rodgers Group, LLC ("Rodgers Group") and Lexipol, LLC's ("Lexipol") (collectively, "Counterclaim Defendants") Motion to Dismiss (ECF No. 64) the Amended Counterclaims of Madeline Lewis ("Lewis"), John String ("String"), and Aspirant Consulting Group LLC ("Aspirant") (collectively, "Counterclaim Plaintiffs") (ECF No. 56). The Motion also contains an Application for Order to Show Cause. (ECF No. 64.) The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons discussed below, the Motion is granted in part and denied in part.

## I.      BACKGROUND

      The Court thoroughly described Counterclaim Defendants' account of the underlying dispute giving rise to this case in its previous memorandum opinion (Mem. Op. 1-3, ECF No. 33),

and thus the Court will only cite the facts necessary to adjudicate Counterclaim Defendants' current Motion.[1]

### A.      Factual Background and Procedural History[2]

Founded in 2008, Rodgers Group provides "policy drafting services, consulting, training and management services to public safety agencies and departments, including first responders and law enforcement" officials. (*Id.* at 1.) In conducting its business, Rodgers Group produces confidential information and trade secrets, and as such, requires its employees to sign "non-disclosure agreements." (*Id.* at 2.)

Lewis and String were hired in May 2020 and April 2021 respectively, as project managers and policy writers for Rodgers Group. (*Id.*) Both had access to confidential information and learned extensively about the company's operations and client relationships. (*Id.*)

Lewis and String, however, conspired to leave the company in late 2021 and start a competing business premised on the same business model. (*Id.*) Between December 2021 and early January 2022, Lewis and String downloaded over 4,000 documents, some of which were confidential, and also accessed Rodgers Group's client lists and project management systems. (*Id.* at 2-3.) Around the same time, Lewis and String registered a website domain for "Aspirant LLC." (*Id.* at 3.) On January 7, 2022, Lewis and String resigned and, on the next day, downloaded

---

[1] The Court cited to Counterclaim Defendants' original complaint (ECF No. 1) in its memorandum opinion. (*See* Mem. Op.) Since the Court's memorandum opinion, Counterclaim Defendants filed an Amended Complaint, which added Lexipol as a plaintiff and removed two counts. (Am. Compl., ECF No. 54.) Because the factual allegations in the complaint and Amended Complaint remain the same (*see* Redline of Compl. and Am. Compl., ECF No. 54-12), the Court will cite to its previous memorandum opinion for the purposes of the current Motion.

[2] For purposes of considering Counterclaim Defendants' Complaint, the Court accepts all factual allegations underlying their Amended Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

hundreds of additional files from Rodgers Group's computer systems. (*Id.*) Soon after, they started Aspirant, a competing security and training business. (*Id.*) Lewis and String converted their login credentials for PowerDMS[3] to their Aspirant email addresses and then began poaching Rodgers Group's clients, causing several Rodgers Group customers to notify Rodgers Group that they were terminating their contracts with Rodgers Group to use Aspirant's services. (*Id.*)

On January 31, 2022, Rodgers Group filed a Complaint against Lewis and String and moved for a temporary restraining order. (Countercl. Defs.' Mot. TRO, ECF No. 3.) Less than a week later, the Court issued a Stipulated Consent Order for a preliminary injunction against Counterclaim Plaintiffs. (Stipulated Consent Order, ECF No. 17.) The Stipulated Consent Order requires Counterclaim Plaintiffs, in part, to refrain from accessing any data that Counterclaim Plaintiffs acquired from Rodgers Group. (*See generally id.*) It also requires Counterclaim Plaintiffs to "surrender control of and restore [Counterclaim Defendants'] access to any PowerDMS account which [Counterclaim Plaintiffs] changed or caused to be changed . . .  except for any PowerDMS accounts for which [Counterclaim Plaintiffs] were directed by the account holder to change the login credentials for such account(s)." (*Id.* ¶ 6.)

Counterclaim Plaintiffs later moved to dismiss six counts of Rodgers Group's eight-count[4] Complaint (Counter Pls.' Mem. L. Supp. Mot. Partial Dismissal 1, ECF No. 21-1), and the Court dismissed without prejudice two counts for failure to state a claim (Mem. Op. 17). Since that dismissal, Rodgers Group joined Lexipol, its purchaser, in this action and collectively filed a

---

[3] "The PowerDMS system is a suite of policy and compliance management tools used by [Rodgers Group] to interface with its clients and to manage the roll out, administration[,] and implementation of policy solutions created by [Rodgers Group]." (Am. Compl. ¶ 84.)

[4] The Court previously described Rodgers Group's Complaint as having nine counts, but only eight are at issue. (*See* Mem Op. 3.)

seven-count Amended Complaint against Counterclaim Plaintiffs alleging violations of state and federal law. (*See generally* Am. Compl.)

Counterclaim Plaintiffs answered, denying most of the allegations in the Amended Complaint (*see generally* Answer, ECF No. 62) and listing affirmative defenses (Affirmative Defenses[5] ¶¶ 1-7, ECF No. 62). Counterclaim Plaintiffs also filed two Amended Counterclaims (*see generally* Am. Countercls., ECF No. 62), which the Court also considers here (*see also* Countercl. Defs.' Mot. Dismiss, ECF No. 64).

**B.      Factual Background of Amended Counterclaims[6]**

Counterclaim Plaintiffs allege: (1) tortious interference with contractual and prospective contractual relationships; and (2) commercial disparagement. (*See* Am. Countercls.) In a nutshell, Counterclaim Plaintiffs portray Counterclaim Defendants—their direct business competitors—as completely determined to destroy Counterclaim Plaintiffs' livelihood. (*See id.* ¶¶ 1-11.) Shortly after resigning from Rodgers Group, Counterclaim Plaintiffs were engaged in business conversations with ten prospective customers: Police Department 1, Police Department 2, Police Department 3, Police Department 4, Police Department 5, Police Department 6, Police Department 7, Police Department 8, Police Department 9, and Police Department 10. (*Id.* ¶¶ 2-4.) Not long after this initial success, however, "Ms. Ruggeri," an employee of Counterclaim Defendants, accessed the PowerDMS sites for Police Departments 1 through 8 (without permission from any

---

[5] Counterclaim Plaintiffs filed its Answer, Affirmative Defenses, and Counterclaims in a single document. (*See* ECF No. 64.) Because Counterclaim Plaintiffs renew the numbering of each section in their document, the Court cites to the relevant subparts within the document.

[6] For purposes of considering the instant Motion, the Court accepts all factual allegations underlying the Amended Counterclaims as true. *See Phillips*, 515 F.3d at 233.

of the departments) and terminated Lewis's access to the departments' respective sites. (*See id.* ¶ 3.)

With the purpose of preventing prospective customers from doing business with Counterclaim Plaintiffs, Rodgers Group sent Lexipol's General Counsel ("General Counsel") a copy of the Stipulated Consent Order. (*See id.* ¶¶ 8, 17.) Even though Lexipol had not yet purchased Rodgers Group, General Counsel, determined to harm Counterclaim Plaintiffs, sent the Stipulated Consent Order to Counterclaim Plaintiffs' prospective customers that General Counsel believed Counterclaim Plaintiffs had "prepared contracts for and/or submitted proposals to" (i.e. Police Department 9, Police Department 10, and other police departments). (*Id.* ¶ 4; *see also id.* at ¶¶ 7, 17.) In doing so, General Counsel "misrepresent[ed] that the [Counterclaim Plaintiffs] had admitted to engaging in unlawful conduct," and threatened that the police departments would become embroiled in litigation if they proceeded to do business with Counterclaim Plaintiffs. (*Id.* ¶ 4.) General Counsel therefore instructed the police departments not to conduct business with Counterclaim Plaintiffs. (*Id.*)

At that time, Counterclaim Plaintiffs were closing in on a contract with Police Department 9 valued at $34,900 for the initial year and $12,500 for the following years thereafter, and Police Department 10 was reviewing Counterclaim Plaintiffs' bid for an accreditation project. (*Id.* ¶¶ 5-6.) Police Department 10 was particularly excited by the prospect of working with Counterclaim Plaintiffs, who were the sole bidder for the project. (*Id.* ¶ 6.) Police Department 10's accreditation manager described Counterclaim Plaintiffs as the "missing piece of the puzzle" to successfully completing the department's accreditation. (*Id.*) Counterclaim Plaintiffs were ultimately awarded Police Department 10's project despite Counterclaim Defendants' actions. (*Id.*)

Counterclaim Plaintiffs were not as fortunate with Police Department 9. After General Counsel's communication with Police Department 9, Counterclaim Plaintiffs lost the contract, causing at least $72,000 in actual pecuniary and consequential damages. (*Id.* ¶¶ 9, 11.) Counterclaim Defendants' actions not only harmed Counterclaim Plaintiffs' goodwill and reputation in the industry (*id.* ¶ 20), but also prevented Counterclaim Plaintiffs from acquiring business from other customers (*id.* ¶ 19).

## II.   **LEGAL STANDARD**

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v Twombly*, 550 U.S. 554, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

6

III.   **DISCUSSION**

The Court considers Counterclaim Plaintiffs' two claims in turn. (*See* Am. Countercls.)

A.   **Tortious Interference with Contractual and Prospective Contractual Relationship[7]**

"[T]o to state a claim for tortious interference with contractual relations and/or prospective economic advantage," a plaintiff must adequately allege:

> (1) the existence of a contract or of a "reasonable expectation of economic advantage;" (2) an intentional and unjustifiable interference with the contract or expectation by defendant; (3) the interference caused the loss of contract or prospective gain;[8] and (4) the injury caused the damage to the plaintiff.

*Dando v. Bimbo Food Bakeries Distrib., LLC*, No. 14-2956, 2016 WL 475262, at *4 (D.N.J. Feb. 8, 2016) (citations removed); *see also Centennial Plaza Prop, LLC v. Trane U.S. Inc.*, No. 22-1262, 2023 WL 7403640, at *3 (D.N.J. Nov. 9, 2023) (citing *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023)).

First, a reasonable expectation of economic advantage claim requires alleged facts that establish more than a "mere hope" of economic gain. *Heartland Payment Sys., LLC v. Carr*, No. 18-9764, 2021 WL 302918, at *7 (D.N.J. Jan. 29, 2021) (citing *Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323, 2013 WL 3772724, at *3 (D.N.J. July 17, 2013)). "In short, a complaint must demonstrate that the plaintiff was in 'pursuit of business'" and that the plaintiff had a "protectable right." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. 10-453, 2010 WL

---

[7] Courts commonly refer to "prospective contractual relationships" as "prospective economic advantage." *See, e.g.*, *Mayer v. Mayer*, No. 23-2272, 2024 WL 1283826, at *7 (D.N.J. Mar. 26, 2024).

[8] Because Counterclaim Plaintiffs allege that they "were able to intervene and ultimately were awarded the contract" with Police Department 10 (Am. Countercls. ¶ 6), their tortious interference claim against Counterclaim Defendant as to Police Department 10 fails. The Court thus considers Counterclaim Plaintiffs' tortious interference claim as to Police Departments 1 through 9 only.

5239238, at *3 (D.N.J. Dec. 16, 2010); *Read v. Profeta*, 397 F. Supp. 3d 597, 642 (D.N.J. 2019)

(quoting *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 750, 751 (1989)).

      Here, Counterclaim Plaintiffs allege that they were "finalizing" contract negotiations with

Police Department 9.[9] (Am. Countercls. ¶ 5.) Discovery may reveal the extent of the relevant

contract negotiations, but at the pleading stage, the Court finds that the Counterclaim Plaintiffs

adequately plead more than a mere hope of economic gain, thus satisfying the reasonable

expectation element.[10] *See Heartland*, 2021 WL 302918, at *7 (internal citations omitted); *Fowler*,

578 F.3d at 210 (explaining that the Court accepts all well-pleaded allegations as true at the motion

to dismiss stage).

      Second, "[a] defendant claiming a business-related excuse must justify not only its motive

and purpose, but also the means used. In that regard, a court will analyze whether the conduct was

sanctioned by the rules of the game, or merely constitutes healthy competition." *Som Maior Audio*

*E Video, Ltda. v. Creston Elecs., Inc.*, No. 20-19864, 2021 WL 5770259, at *4 (D.N.J. Dec. 3,

2021) (internal quotations removed) (quoting *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 307

(2001)) (finding that "fraudulent, *dishonest*, or illegal" actions are outside the "rules of the game"

---

[9] On the other hand, Counterclaim Plaintiffs allege that they were only "engaged" with Police
Departments 1 through 8 to potentially provide business services, but provide no further factual
support or details. (Am. Countercls. ¶ 2.) Without more, the Court finds that Counterclaim
Plaintiffs fail to adequately satisfy the reasonable expectation element as to Police Departments 1
through 8 for a tortious interference claim. *Church & Dwight Co.*, 2010 WL 5239238, at *4
("Because [p]laintiff has alleged ongoing and expected sales to the public at large, it has
sufficiently alleged a reasonable expectation of economic benefit."). Accordingly, the Court
considers the requisite elements of a tortious interference claim as to Police Department 9 only in
its remaining analysis.

[10] In their opposing brief, Counterclaim Defendants emphasize the underlying facts of *their*
Complaint (*see* Countercl. Defs.' Br. Supp. Mot. Dismiss 2, ECF No. 64), which are irrelevant for
purposes of this Motion. *See RJ Brands, LLC v. Bloomberg, L.P.*, No. 21-1908, 2022 WL 683082,
at *2 (D.N.J. Mar. 8, 2022) (emphasis added) (explaining that at the motion to dismiss stage for
counterclaims, the court accepts all well-pleaded allegations as true in the *counterclaim*).

(emphasis added)); *Church & Dwight Co.*, 2010 WL 5239238, at *6 ("[M]alice is defined as a harm that was inflicted intentionally and without justification or excuse"). Here, Counterclaim Plaintiffs allege that Counterclaim Defendants sent the Stipulated Consent Order to Counterclaim Plaintiffs' customers and *falsely represented* that Counterclaim Plaintiffs admitted liability in the present litigation. (*See* Am. Countercls. ¶¶ 4-5.) The Court, accordingly, finds that Counterclaim Plaintiffs adequately plead malice at this juncture, based on allegations that Counterclaim Defendants disseminated false statements about a competitor to the competitor's prospective customer. *See Industria de Alimentos Zenu S.A.S.*, 2018 WL 1226103, at *6-7 (finding malice for a tortious interference claim when defendant made "willfully false statements" about plaintiff and its products); *Church & Dwight Co.*, 2010 WL 5239238, at *7 (finding that a defendant's "false and misleading representations" to a third party, impacting plaintiff's business, sufficed to satisfy the malice element in the motion to dismiss stage). "Whether or not Defendant[s] did, in fact, act with 'malice,' is an issue of fact, not appropriately decided on a motion to dismiss." *Id.*

As to the third and fourth elements, Counterclaim Plaintiffs allege that they were "in the process of finalizing an initial contract with Police Department 9 representing services valued at $34,900 for the initial year and $12,500 for the following years thereafter." (Am. Countercls. ¶ 4; *see id.* ¶ 10.) As a result of Counterclaim Defendants' interference, Counterclaim Plaintiffs assert that they lost the contract and expected advantages, as well as "actual pecuniary and consequential damages . . . in an amount that is at least $72,000." (*Id.* ¶ 11.) Counterclaim Plaintiffs also allege that they have suffered damage to their reputation and goodwill due to Counterclaim Defendants' tortious conduct. (*Id.* ¶ 12.) Again, at this juncture, the Court finds that Counterclaim Plaintiffs have adequately alleged that they lost a potential contract and related prospective gain.

In sum, the Court finds that Counterclaim Plaintiffs adequately state a claim for tortious interference with respect to Police Department 9.

### B.    Commercial Disparagement[11]

The Third Circuit has clarified that "[a]n action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability . . . ." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990). To state a claim for commercial disparagement, Counterclaim Plaintiffs must plead four elements: "(1) [a] publication[;] (2) with malice[;] (3) of false allegations concerning *plaintiff's property or product*[;] (4) causing special damages, i.e., pecuniary harm." *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-1371, 2016 WL 740267, at *6 (D.N.J. Feb. 24, 2016) (emphasis added) (citing *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977)) (noting that plaintiff must plead and prove the elements with particularity).

Here, Counterclaim Plaintiffs allege that Counterclaim Defendants "knowingly and recklessly disseminated or caused to be disseminated false and disparaging statements and allegations *about [Counterclaim Plaintiffs]* to [their] customers . . . by sending a copy of the Stipulated Consent Order . . . along with a communication misrepresenting that *[Counterclaim Plaintiffs] had admitted to engaging in unlawful conduct*[.]" (Am. Countercls. ¶ 15 (emphasis added).) Importantly, Counterclaim Plaintiffs plead that the misrepresented statements were about Counterclaim Plaintiffs themselves, not Counterclaim Plaintiffs' product, services, or goods.[12] *See*

---

[11] Commercial disparagement is also known as "trade libel" under New Jersey law. *Pactiv Corp. v. Perk-Up, Inc.*, No. 08-5072, 2009 WL 2568105, at *10 (D.N.J. Aug. 18, 2009).

[12] Although Counterclaim Plaintiffs plead that "[t]he disparaging statements were derogatory to [Counterclaim Plaintiffs'] business" (Am. Countercls. ¶ 16), they do not provide any other factual allegations of support to demonstrate that the false allegations concern their product or services. *Intervet, Inc.*, 2016 WL 740267, at *6.

*Intervet, Inc.*, 2016 WL 740267, at *6; *U.S. Healthcare, Inc.*, 898 F.2d at 927 ("[N]o action for commercial disparagement will lie because the statements are directed at the vendor, not his goods [or product]").

The Court, therefore, dismisses Counterclaim Plaintiffs' commercial disparagement claim without prejudice.[13]

## IV.   **CONCLUSION**

For the above reasons, the Court grants in part and dismisses in part Counterclaim Defendants' Motion. An appropriate order will follow this Memorandum Opinion.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

---

[13] With this finding, the Court finds Counterclaim Defendants' Application for an Order to Show Cause as to why Counterclaim Plaintiffs' commercial disparagement claim should not be dismissed to be moot.

11